UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO 07-60027-CR-ZLOCH/Snow

UNITED STATES OF AMERICA,

       Plaintiff,

v.

FRANK HERNANDEZ, et al.

       Defendants.

---

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the following motions to suppress, which were referred to United States Magistrate Judge Lurana S. Snow, for report and recommendation:

      1. Defendant **Howard Helfant's** Motion to Suppress Evidence (DE 504);

      2. Defendant **Paul Wiseberg's** Motion to Suppress Evidence and Request for a *Franks* Hearing (DE 518) adopted by defendants **Edgar Cruz and Thomas Walker**;

      3. Defendant **Frank Hernandez'** Motion to Suppress: No Crime Delineated to Support Issuance of Search Warrant (DE 533) adopted by defendant **Steve Marhee**, and

      4. Defendant Amada Hernadez' Motion to Suppress: No Crime Delineated to Support Issuance of Search Warrant (DE 534).

      The indictment in this case charges twenty-one defendants with conspiracy to distribute Schedule III and IV controlled

substances in connections with sales over the Internet, in violation of 21 U.S.C. § 846 (Count 1). The defendants charged include three physicians (Everett Echols, Hannibal Edwards and David Baron), three pharmacists (Edgar Cruz, Thomas Walker and Serge Francois), eight business owners (Frank Hernandez, Amada Hernandez, Steven Marhee, Emmanuel Antonio, Lawrence Pinkoff, Theophilos Antoniou, Paul Wiseberg and Howard Helfant) and seven corporations (C & H Wholesale, Lifeline Pharmacy, Inc., EZ RX, LLC, E.V.A. Global, Inc., Tropic Spiral Systems Inc., RX Direct Pharmacy, Inc. and Concept RX, Inc.).

The indictment also contains eleven substantive counts, charging various combinations of defendants with distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and a forfeiture provision. It alleges that during the two-year course of the conspiracy (May 2002 - May 2004), a total of 122,194 prescriptions were written for more than nine million pills, consisting primarily of diet pills and sleeping pills.

All four motions to suppress challenge two search warrants issued for the premises of RX Direct Pharmacy, Inc., in Deerfield Beach, Florida. The first search warrant was issued by the undersigned on April 27, 2004; the second was issued by United States Magistrate Judge Edwin Torres on May 18, 2004. Copies of the search warrants and supporting applications are attached to defendant Wiseberg's Motion to Suppress. (DE 518-2 - 518-5.)

Defendants Helfant and Wiseberg owned and operated this business. Defendants Frank and Amada Hernandez were the owners of C&H Wholesale, Inc., Lifeline Pharmacy, Inc., and EZ RX, LLC. The Government does not contest the standing of these four defendants to challenge the search warrants.

Three other defendants have adopted one or more of the motions to suppress: Edgar Cruz (pharmacy manager at Lifeline Pharmacy and EZ RX), Stephen Marhee (chief financial officer of C&H Wholesale, Inc.) and Thomas Walker (a pharmacist at Lifeline). The Government contends that none of these three defendants had a reasonable expectation of privacy in the premises to be searched.

A hearing was held on these motions on September 18, 2007, and additional testimony was taken on October 1, 2007. Based on a review of the search warrants, the testimony presented and the applicable case law, it is recommended that all motions to suppress be DENIED.

## I. **THE SEARCH WARRANTS**

### A. **First Warrant (April 27, 2004)**

The application for this warrant (hereinafter referred to as the "April warrant") was supported by the affidavit of Donna Richards, a Diversion Investigator with the Drug Enforcement Administration (DEA). In her affidavit, Investigator Richards states that she had been employed in this capacity for sixteen years, and that her duties include the conduct of regulatory, civil

3

and criminal investigations of DEA registrants[1] related to their controlled substance activities. Investigator Richards further states that she was knowledgeable of the laws, regulations and procedures pertinent to the investigations of the diversion of controlled substances to the illicit market as well as the techniques employed by registrants to divert controlled substances. She relates that she also has experience with the illegal distribution of controlled substances through Internet pharmacies, wherein customers order controlled substances prescriptions via Internet web sites absent a legitimate physician/patient relationship. (April affidavit, DE 518-3, pp. 1-2.)

Investigator Richards recites that she had been conducting an investigation of the illegal distribution of controlled substances through E.V.A. Global, Inc., a company which processed orders for controlled and non-controlled substances via the Internet and forwarded the orders to cooperating pharmacies for the orders to be filled. One such pharmacy was RX Direct, Inc., which first had registered with the DEA on April 29, 2003, when it was operating in Boca Raton, Florida. The company moved to Deerfield Beach on June 11, 2003. Id. at 3.

---

[1] Pursuant to 21 U.S.C. § 821, persons who wish to lawfully dispense or distribute controlled substances, such as doctors and pharmacists, must register with the Attorney General. Authorization to dispense or distribute controlled substances must be consistent with the individual's registration and in conformity with other provisions of the Controlled Substances Act.

The affidavit states that on November 24, 2003, a Diversion Investigator in San Antonio, Texas, made an undercover purchase of 90 phentermine capsules via the Internet, through a web site called Onlinepharmacy.com. The investigator listed his reason for wanting the drugs as a desire to lose weight. The investigator was directed to send payment to E.V.A. Global. Investigator Richards mailed in the payment, and the drugs were delivered to an undercover address in Fort Lauderdale, Florida. The return address on the package was RX Direct Pharmacy, 1020 NW 5th St., Deerfield Beach, Florida (the premises to be searched). The drug vial listed the authorizing physician as Dr. Everett Echols. However, the undercover investigator who ordered the drugs never spoke to a pharmacist or to Dr. Echols. Id. at 4-5.

The affidavit next recites that on January 24, 2004, Elizabeth Duvall received from RX Direct a prescription vial containing 120 phentermine capsules and listing Dr. Rhanvir Ahlawat as the authorizing physician. Ms. Duvall told DEA that at this time, she had never had any contact with RX Direct or with Dr. Ahlawat. Ms. Duvall called the customer service number for RX direct to notify the pharmacy that she had not ordered these drugs. She was told that E.V.A. Global would send Federal Express to her home to pick up the package, but this never was done. Id. at 5-6.

The affidavit goes on to state that on March 4, 2004, DEA investigators interviewed John Parks regarding his drug purchases via the Internet. Mr. Parks stated that for the preceding two

5

years, he had been treated by a psychologist and a psychiatrist for anxiety and depression, and that he once had attempted to commit suicide with drugs he had obtained via the Internet.  Mr. Parks reported that on January 28, 2004, he ordered ninety tablets of clonazepam (a Schedule IV controlled substance used to treat panic disorders) from a web site.  Mr. Parks was not required to submit medical records and there was no medical consultation.  Mr. Parks received the drugs from RX Direct in Deerfield Beach, in a vial which reflected that the order was authorized by Dr. Hannibal Edwards.  Id. at 6-7.

Next, Investigator Richards states that in March 2004, another undercover purchase of phentermine was made, this time using the web site fda-rx.com.  The drugs were sent out by RX Direct at the Deerfield Beach address, and listed Dr. Echols a the authorizing physician.  Id. at 7.

The affidavit recites that in April 2004, the DEA Chicago Diversion Group obtained a Federal Express package that had been turned over to the Aurora, Illinois Police Department.  The package had been mailed by RX Direct and mailed to Heather Beaman in Aurora, Illinois.  Ms. Beaman had turned over the package to the police because she discovered that it contained drugs which had not ordered.  The package contained a vial of 30 phentermine capsules that indicated that the drugs had been prescribed for Ms. Beaman by Dr. David Baron.  Id. at 7-8.

Investigator Richards next states that on April 13, 2004, she interviewed a cooperating source (CS) regarding RX Direct and its owner, Howard Helfant.  The CS told Investigator Richards that recently Helfant had approached the CS about becoming involved in the Internet pharmacy business.  According to the CS, Helfant related that RX Direct filled 3,000 to 4,000 prescriptions per day and that the average Internet order was for $250.  Helfant further told the CS that RX Direct takes in between 3.6 and 4 million dollars per month.  Id. at 6-9.

During this same interview, the CS told Investigator Richards that during the week of April 4, 2004, Helfant gave the CS a tour of the premises of RX Direct.  The CS observed six to eight "pill counters" (pharmacy technicians) who were pre-packing drugs for shipment.  The CS saw that among the drugs being pre-packed were vials of hydrocodone, a Schedule III narcotic.  The CS learned that RX Direct employed only one pharmacist and that the pharmacy was staffed from 9:00 a.m. to 5:00 p.m.  The affidavit states that subsequent surveillance had confirmed that the business was occupied from 8:30 a.m. to approximately 5:30 p.m.  Id. at 9.

The CS also told Investigator Richards that during the tour of RX Direct, the CS observed four computers.  Helfant pointed out one of the computers and told the CS that it was used to obtain and print out Internet prescriptions.  Id.

The affidavit next states that on April 21, 2004, Helfant told the CS that he routinely closes his pharmacies within one year

7

of opening them to avoid inspection by government authorities.
Investigator Richards noted that Helfant was the owner of Lakeridge
Pharmacy in Boca Raton, a pharmacy which became licensed by the
State of Florida on September 17, 2003.  Confidential sources had
informed DEA that this pharmacy had been filling prescriptions for
controlled substances pursuant to information generated from online
questionnaires.  On February 27, 2004, the State of Florida was
notified that Lakeridge Pharmacy had closed. As of April 27, 2004,
DEA had not been notified that the pharmacy had closed.  Id. at 10.

Investigator Richards states that during the preceding
several weeks, Helfant had told the CS that he intended to re-open
Lakeridge Pharmacy and to move RX Direct to a new location on
Powerline Road in Pompano Beach, Florida.  Helfant told the CS that
the building at the location was under construction, and Helfant
anticipated that the move would take place within the next seven to
ten days, as soon as construction was completed.  Investigator
Richards did not know whether the data and records of controlled
substances distributed by RX Direct would be moved to the new
location.  Id. at 11.

Inspector Richards then summarizes what she believed to
be the applicable law governing the issuance of prescriptions, as
follows:

> 31. According to Title 21, United States Code
> of Federal Regulations, Section 1306.04, "A
> prescription for a controlled substance to be
> effective must be issued for a legitimate
> medical purpose by an individual practitioner
> acting in the usual course of his professional

8

practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provision of law relating to controlled substances."

32. In April 2001, the Drug Enforcement Administration posted a Federal Register Notice giving guidance regarding the dispensing and purchasing of controlled substances over the Internet. The notice states, "Under Federal and state law, for a doctor to be acting in the usual course of professional practice, there must be a bona fide doctor/patient relationship. Completing a questionnaire that is then reviewed by a doctor hired by the Internet pharmacy could not be considered the basis for a doctor/patient relationship."

Id. at 11-12.

Investigator Richards notes that Dr. Hannibal Edwards was registered with the DEA in the State of California and was licensed to practice medicine in that state. She further recites that California Statute 2242(a) states: "Prescribing, dispensing or furnishing dangerous drugs without a good faith prior examination and medical indication therefore, constitutes unprofessional conduct." Investigator Richards goes on to state that the prescriptions described earlier in her affidavit were not preceded

by an in-person consultation or physical examination by the authorizing physicians. Id. at 12.

Investigator Richards relates that based on her personal experience and that of other experienced agents information concerning the operation of Internet pharmacies routinely are stored in computer hardware and computer software. She adds that she had learned through her investigation that RX Direct dispensed prescription controlled substances pursuant to the electronic transmittal or prescription drug orders. Therefore, she believed that RX Direct stored information on computers which reflected the activity described in the affidavit. Id. at 13-14.

Investigator Richards believed that the computers and computer media which would be found at the Deerfield location of RX Direct "are instrumentalities used to further, and contain evidence of, the dispensation of prescription controlled substances via the Internet where no legitimate physician/patient relationship was established." Id. at 14.

Investigator Richards also points out that as a regulated entity under the Controlled Substances Act, RX Direct was required to keep accurate and complete records of all controlled substances received, sold, delivered or otherwise disposed of at the registered location for the preceding two years. Therefore, Investigator Richards expected that these records, as well as other business records, would be found at the Deerfield address. She

10

also noted subsequent analysis of computer data might require the retrieval of relevant systems and applications software. Id. 14-15.

Investigator Richards expresses her opinion that there was probable cause to believe that evidence of violations of the federal narcotics and money laundering statutes were being maintained at the RX Direct premises. She asks the court to authorize "the copying (imaging) of electronically stored records, e-mail messages and data evidencing and relating to the unlawful distribution of prescription controlled substances via the Internet by RX Direct Pharmacy, Inc." Id. at 15.

Investigator Richards reiterates that Howard Helfant, owner of RX Direct, had made statements indicating that he intended to move the pharmacy to a new location in the immediate future, and it was not known whether the pharmacy records would be relocated as well. She also reiterates that Helfant had stated that he had shut down other pharmacies in order to avoid administrative inspections, and that in fact, the Lakeridge Pharmacy had been closed after five months, without notification to the DEA. Id. at 16-17.

Based on these on these facts, Investigator Richards explains:

> Because of the nature of the business of RX Direct Pharmacy Inc., and the fleeting nature of electronically stored records, should the pharmacy operation change location it is believed that there is a likelihood that valuable evidentiary information will be lost, destroyed or its location will become unknown to law enforcement. Additionally, because there is an ongoing undercover investigation of the subjects of this investigation, it

11

would be detrimental to the investigation for
an overt search warrant to be executed during
normal business hours at this time. The overt
execution of a search warrant at this time may
result in endangering the life or physical
safety of the CS; may result in the subjects
of the investigation fleeing from prosecution
before the investigation is complete; may
result in the subjects destroying or tampering
with evidence at as yet unidentified
locations; and would likely seriously
jeopardize the potential success of the
undercover investigation by alerting the
subjects to the existence of law enforcement
scrutiny.

Id. at 17-18.

Accordingly, Investigator Richards concludes her
affidavit by asking the Court to dispense with the service of a
copy of the warrant and a receipt for any items taken from the
premises of RX Direct for a period of 30 days, or until otherwise
ordered by the Court. She also sought permission to execute the
warrant in a surreptitious fashion after the close of business and
continuing during the hours of 10:00 p.m. and 6:00 a.m. so that the
owners/operators of RX Direct would be unaware of the execution.
Id. at 18.

Based on this affidavit, the undersigned issued the
search warrant as requested. (April search warrant, DE 518-2).
Additionally, the undersigned issued an Order granting the
Government's motion to delay notice of execution of the warrant for
30 days and dispensing with the requirement that a copy of the
warrant and a receipt for property taken be left at the premises.
(DE 518-6 and 518-7.)

12

**B. Second Search Warrant (May 18, 2004)**

The affidavit in support of the second search warrant (hereinafter the "May warrant") also was authored by Investigator Richards. (May affidavit, DE 518-5) This affidavit reiterates all of the material set forth in the application for the April warrant, with the exception of the information pertaining to Howard Helfant's plan to move RX Direct to a new location. The affidavit also includes the following additional information pertaining to Helfant and RX Direct:

> 31. Expert-Med, 400 Andalusia Avenue, Ormond Beach, Florida 32174 is registered with the Drug Enforcement Administration as a distributor of Schedule II, III, IV and V controlled substances. Expert-Med reported that RX DIRECT PHARMACY, INC., purchased approximately one million, two hundred and three thousand (1,203,000) dosage units of hydrocodone during the month of April 2004.
>
> 32. On April 28, 2004, a DEA Special Agent, acting in an undercover capacity, met with Howard Helfant, owner of RX DIRECT PHARMACY, INC., so that Helfant could explain the Internet pharmacy business to the Special Agent. The Special Agent was acting as a potential investor in additional Internet pharmacies.
>
> 33. Helfant advised the Special Agent that his weekly paycheck was in the "six figure" range. Helfant stated that his partner, Paul Wiseberg, also took home a six figure paycheck in addition to the pharmacy carrying a two million dollar inventory of drugs. Helfant advised that RX DIRECT PHARMACY, INC.'s Internet business consisted of ninety percent diet pills. Helfant stated that the pharmacy also fills prescription orders for hydrocodone. The pharmacy receives $40 for every hydrocodone prescription filled and $10 each for all of the other prescription orders.

34. Helfant explained that the Internet companies reject a low percentage of orders per day to "make it look good." Helfant further added that RX DIRECT PHARMACY, INC., also rejects one to three prescriptions daily that have already been authorized by a physician to make it appear that the pharmacy is a legitimately practicing pharmacy.

35. Helfant explained that the Internet companies pay the Federal Express shipping costs and the pharmacy bills the Internet companies weekly for the "per prescription" charges.

Id. at 10-12.

Investigator Richards then discusses the execution of the April search warrant. She states that inside Rx Direct, she and other agents observed "documents related to the filling of prescriptions via the Internet, including a contract between RX DIRECT PHARMACY, INC., and E.V.A. Global, Inc., and invoices for prescription orders filled through Hope Mills Universal and other Internet companies. Photocopies were made of these documents. Id. at 12.

Investigator Richards states that she also observed "large quantities of pre-packaged vials (thirty to ninety tablets each) of controlled substances, including various strengths of hydrocodone and phentermine," as well as "quantities of Federal Express shipping supplies, including Federal Express envelopes." Id. However, the pharmacy was not stocked with any of the usual assortment of controlled and non-controlled substances or sundry items that customarily are found in a retail pharmacy. Id. at 13.

14

As in the April affidavit, Investigator Richards explains that based on her training and experience, and that of other experienced agents, she knew that information pertaining to the operation of a business may be stored in computer hardware or computer software. She elaborates:

> The information may be stored in the form of electronic or magnetic coding on computer media or computer related equipment. This media includes but is not limited to fixed hard drive disks, laser disks, tapes, floppy diskettes, CD-ROMS and other media capable of storing electronic or magnetic coding. This computer hardware and software and other computer media is important to a criminal investigation in that the information stored therein may contain records including (but not limited to): lists of customers and related identifying information; types, amounts and prices of items sold (including names, addresses, telephone numbers, or any other identifying information); information related to schedules or travel in furtherance of the business; journals and ledgers; payroll and other business expenses; bank records, checks, credit card charges, account information and other financial records.[2]

Id. at 14-15.

Also as in the April affidavit, Investigator Richards expresses her belief that the computers and computer media at RX Direct "are instrumentalities used to further, and contain evidence of, the dispensation of prescription drugs, including controlled substances, via the Internet where no legitimate physician/patient relationship was established." Id. at 15-16.

---

[2] This list also was included in the April affidavit. (DE 518-3, p. 13.)

Accordingly, Investigator Richards requested a search warrant authorizing the search of the premises of RX DIRECT PHARMACY, INC., and the seizure of all records of controlled substances received, sold, delivered, dispensed or otherwise disposed of by RX DIRECT PHARMACY, INC., including but no limited to:

> (1) DEA Forms 222, pharmaceutical distributor's invoices and shipping records, pharmacy invoices, medical questionnaires, prescriptions, and shipping records;
>
> (2) Records of the receipt of payment for the sale or dispensing of controlled substances, including financial ledgers and work papers, and bank records;
>
> (3) Records evidencing the disposition of the proceeds of the sale or dispensing of controlled substances, including bank records, tax returns, and other financial records evidencing the disposition of the proceeds;
> (4) Records concerning the ownership and control of RX DIRECT PHARMACY, INC., E.V.A. Global, Inc., and any other entity which is involved in the sale or dispensing of Internet prescriptions for controlled substances with the above, or through which payments for which are received or disposed of, and
>
> (5) Lists of employees of RX DIRECT PHARMACY, INC., and E.V.A. Global, Inc., and records relating to the relationship between RX DIRECT PHARMACY, INC., E.V.A. Global, Inc., and Hope Mills Universal, including contracts, employment agreements and correspondence.

Id. at 17-18.

On May 18, 2004, United States Magistrate Judge Edwin Torres issued a search warrant authorizing the seizure of these enumerated documents for the period of April 1, 2003, through the

16

date of the warrant.   (DE 518-4.)   The warrant explicitly
authorized the seizure of:

> any of the above-described stored in computer
> hardware or software, in other forms of
> electronic or magnetic coding, on computer
> media or computer related equipment.  These
> media include but are not limited to
> computers, computer components, computer
> peripherals, word processing equipment,
> modems, monitors, cables, printers, plotters,
> encryption circuit boards, optical scanners,
> external hard drives, external tape backup
> drives, laser disk, tapes, floppy diskettes,
> CD-ROMS and other media capable of storing
> magnetic or electronic coding.

Id. at Attachment A, p. 2.

Additionally, the warrant authorized the seizure of
computer instructions and programs stored in the form of electronic
or magnetic media, as well as written or printed material which
provided instruction or examples concerning the operation of
computer systems, and passwords, encryption codes or other
information needed to access the computer system and/or software
programs.  Id. at Attachment A, pp. 2-3.

## II. **MOTIONS TO SUPPRESS**

### A. **Howard Helfant (DE 504)**

Defendant Helfant contends that evidence seized pursuant
to both search warrants must be suppressed on grounds that the
supporting affidavits fail to set forth probable cause because the
acts alleged did not constitute a crime, and do not establish the
reliability of the CS.  Additionally, the defendant asserts that
the affiant, Investigator Richards, deliberately omitted material

17

facts concerning the reliability of the CS, and also failed to disclose: the fact that the reported deliveries of unordered drugs could have been the result of a mistake, the fact that there had been only one instance in which a pharmacy had been moved and the fact that the conduct she described did not constitute a crime.

Helfant also raises the following claims: that the April search warrant was over broad because it failed to place any limit on the dates of the documents to be seized; that there were insufficient facts to support a surreptitious entry and delay of notice of the April warrant, and that the agents executing the May warrant were not authorized to seize computers.

## B. **Paul Wiseberg (DE 518-1)**

Defendant Wiseberg also argues that the affidavit supporting the search warrants fails to set forth probable cause to believe that any crime had been committed and does not establish the reliability of the CS. Additionally, he contends that Investigator Richards deliberately omitted material facts.

Specifically, Wiseberg asserts that the investigator omitted the registered address of RX Direct and the location of the tour taken by the CS. She also made no mention in the May affidavit that the CS had told her that Helfant had been planning to move the business shortly after the time that the April warrant was executed, and recited no facts indicating that the pharmacy was still located at the Deerfield Beach address. Another purported omission was Investigator Richards' failure to advise Judge Torres

18

that the entire hard drives of the four RX Direct computers had been copied during the April search.   In fact, the May affidavit omitted any mention of whether computers had been observed during the execution of the April warrant.

Defendant Wiseberg's other grounds for invalidating the search warrants are: that both warrants are over broad and fail to identify the items to be seized with sufficient particularity; that there was no justification of the surreptitious entry and delayed notice in connection with the April warrant; that the 30-day delay of notice was longer than permitted by F.R. Crim. P. 41; that no copy of the warrant and inventory ever was delivered, and that the warrant improperly authorized the agents to make copies of the computer hard drives.

Finally, the defendant maintains that the execution of the May warrant was flawed because it amounted to a wholesale seizure of documents and because the warrant did not specifically authorize any off-site analysis of the computers.

## C. **Frank and Amada Hernandez (DE 533 and DE 534)**

Both defendants contend that the affidavits supporting the search warrants fail to establish probable cause to believe that any crime had been committed.   They argue that a regulation such as 21 C.F.R. § 1306.04(a), on which Investigator Richards relies, cannot form the basis for a criminal offense.    The defendants rely on the recent Supreme Court decision in Gonzalez v. Oregon, 546 U.S. 243 (2006).

### III. RECOMMENDATIONS OF LAW

### A. Standards for Review of Search Warrants

Review of the conduct of DEA investigators in obtaining and executing the search warrants for the defendants' pharmacy is controlled by <u>United States v. Leon</u>, 468 U.S. 897 (1984). In creating what has been called a "good faith exception" to the exclusionary rule, the Court recognized that the rule "operates as `a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" <u>Id.</u> at 906, quoting <u>United States v. Calandra</u>, 414 U.S. 338, 348 (1974). The Court noted that the articulated purpose of the exclusionary rule never had been to punish the errors of judges and magistrates, and there is no evidence to suggest that judges or magistrates are inclined to ignore or subvert the Fourth Amendment or that "exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." <u>Leon</u>, 468 U.S. at 916. Accordingly, the Court concluded that "suppression of evidence seized pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule". <u>Id.</u> at 918.

The Court noted that in an ordinary case, a police officer cannot be expected to question a magistrate's probable cause determination or judgment that the form of the warrant is

20

technically correct. However, suppression of evidence seized pursuant to a warrant still might be proper in those rare instances where the officer has no reasonable grounds for believing that the warrant was properly issued. Id. at 921-923. Therefore, the Court recognized four situations where a finding of good faith reliance would not be appropriate:

1.   Where the magistrate or judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, as discussed in Franks v. Delaware, 438 U.S. 154 (1978);

2.   Where the issuing magistrate wholly abandoned his or her judicial role and becomes a "rubber stamp" for the police, as in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319 (1979);

3.   Where the warrant is based on an affidavit that is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, as in Brown v. Illinois, 422 U.S. 590, 610-611 (1975); and

4.   Where a warrant is so facially deficient, as where it fails to particularize the place to be searched or the items to be seized, that the executing officers cannot reasonably presume it to be valid. Leon, 468 U.S. at 923.

In the instant case, counsel for defendant Wiseberg argued that the first, third and fourth exceptions carved out by Leon apply. The other defendants did not identify the exceptions they deemed to be applicable to their respective motions. However,

defendant Helfant does raise a claim that deliberate omissions of material fact were made by Inspector Richards in both affidavits, suggesting that he is relying on the first exception, as it pertains to this claim.

## B. Probable Cause

Each of the defendants contends that the facts set forth in the instant indictment fail to establish probable cause to believe that any crime had been or was being committed. In so doing, the defendants have incorporated arguments raised in the various motions to dismiss the instant indictment.

The conduct described in the search warrant affidavits in the instant case involves the sale of prescription drugs over the Internet without a face-to-face meeting between the person purchasing the drugs and the prescribing doctor or the pharmacists who fills the prescription. The defendants argue that this conduct does not violate the federal drug laws.

In Illinois v. Gates, 462 U.S. 213, 238 (1983), the United States Supreme Court established the following guidelines to be used in making probable cause determinations:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]"

22

that probable cause existed. <u>Jones v. United States</u>, 362 U.S. at 271.

The issue of whether registered medical professionals are subject to prosecution under 21 U.S.C. §§ 841(a)(1) was settled in <u>Moore v. United States</u>, 423 U.S. 122 (1975). In <u>Moore</u>, the respondent was a registered physician charged with distribution of methadone, even though he was dispensing the drug to patients by prescription. The Supreme Court held that "only the lawful acts of registrants are exempted" from the provisions of § 841. <u>Id.</u> at 131.

The Court rejected the respondent's argument that his conduct was "authorized" by the provisions of the CSA, holding that "the scheme of the statute, viewed against the background of the legislative history, reveals an intent to limit a registered physician's dispensing authority to the course of his 'professional practice.'" <u>Id.</u> at 140. Thus, "[i]mplicit within the registration of a physician is the understanding that he is authorized only to act 'as a physician.'" <u>Id.</u> at 141. The issue of whether a physician's conduct exceeds the bounds of professional practice, rendering him criminally liable under § 841, is one for determination by a jury. <u>Id.</u> at 142.

Since <u>Moore</u>, federal appellate courts have upheld prosecutions of pharmaceutical personnel for violating 21 U.S.C. § 841. <i>See, e.g.,</i> <u>United States v. Limberopoulos</u>, 26 F.3d 245 (1st Cir. 1994) (pharmacist); <u>United States v. DeBoer</u>, 966 F.2d 1066 (6th Cir. 1992) (pharmacy tech). Additionally, courts have held that

medical professionals, pharmacists and even lay persons can conspire with physicians to dispense or distribute drugs in violation of the statute. United States v. Hayes, 595 F.2d 258 (5th Cir. 1979), *cert. denied*, 444 U.S. 866 (1979) (pharmacist); United States v. Vamos, 797 F.2d 1146 (2nd Cir. 1986), *cert. denied*, 479 U.S. 1036 (1987) (physician's nurse and pharmacist); United States v. Green, 511 F.2d 1062 (7th Cir. 1975), *cert. denied*, 423 U.S. 1031 (1975) (owner of pharmacy and of building in which pharmacy and clinic were located); United States v. Albert, 675 F. 2d 712 (5th Cir. 1982) (unindicted co-conspirators); United States v. Hicks, 529 F. 2d 841 (5th Cir. 1976), *cert. denied*, 429 U.S. 856 (1976) (security guard).

More importantly for purposes of the instant case, the Courts of Appeal have upheld convictions of physicians and pharmacists for distributing controlled substances over the Internet. United States v. Fuchs, 467 F. 3d 889 (5th Cir. 2004), *cert. denied*, 127 S.Ct. 1502 (2007); United States v. Nelson, 383 F.3d 1227 (10th Cir. 2006).

In some of the cases dealing with prosecutions of physicians and pharmacists under 21 U.S.C. § 841, the courts have referred to the interpretive regulation quoted by Inspector Richards in the April and May affidavits, which requires that every prescription for a controlled substance "be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."   21 C.F.R. § 1306.04(a).

24

*See, e.g.*, <u>United States v. DeBoer</u>, 966 F.2d 1066, 1068 (6th Cir. 1992) (physician/defendant referred to this regulation as providing a "good faith" defense); <u>United States v. Green</u>, 511 F.2d 1062, 1069-70 (7th Cir. 1975) (holding that the predecessor regulation, 21 C.F.R. § 306.04(a), does not expand the meaning of § 841(a), but rather seeks to define the exemption clause of that section).

In the recent decision of <u>Gonzalez v. Oregon</u>, 546 U.S. 243, 126 S.Ct. 904 (2006), the Supreme Court considered the validity of an Interpretive Rule, issued by former Attorney General John Ashcroft pursuant to this regulation, determining that the use controlled substances to assist suicide is not a legitimate medical practice and that dispensing or prescribing controlled substances for this purpose violates the CSA.  The State of Oregon, which had enacted a statutory scheme permitting such prescriptions under certain carefully defined circumstances, and others, brought suit to enjoin enforcement of this Interpretive Rule.

The Government argued that the Rule was an elaboration of 21 C.F.R. § 1306.04(a), one of the Attorney General's own regulations.  The Court rejected this argument, finding that the regulation did "little more than restate the terms of the statute itself," by repeating two statutory phrases and attempting to summarize others. <u>Gonzalez</u>, 126 S.Ct. at 915. The Court found that the Attorney General's interpretation of the statute was not entitled to deference, concluding that "the CSA's prescription requirement does not authorize the Attorney General to bar

25

dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct." Id. at 925.

In reaching this conclusion, the Court found that the CSA's prescription requirement is "a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse," and which "bars doctors from peddling to patients who crave the drugs for those prohibited uses." Id., citing Moore, 423 U.S. at 135, 143. Thus, the CSA regulates medical practice only "insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood." Gonzalez, 126 S.Ct. at 923.

Based on these cases, it is clear that the affidavits in support of the April and May search warrants established that there was "a fair probability that contraband or evidence of a crime" would be found on the premises of RX Direct. Gates, 462 U.S. at 371. Even if probable cause had not been so clearly established, it cannot be said that either warrant "was based on affidavit that is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923.

Defendants Helfant and Wiseberg also argue that the affidavits were deficient because they failed to establish the reliability of the CS. The courts consistently have held that the

26

reliability of an informant may be established by the amount of detail contained in the information provided, by verification of some of the information by independent police investigation, by the fact that the statements made are against the penal interest of the informant, and by corroborative information given by other informants. Gates, 462 U.S. at 238; United States v. Weinrich, 586 F.2d 481, 487-490 (5th Cir. 1978), cert. denied, 441 U.S. 927 (1979).

In the instant case, the CS provided detailed information, some of which had been verified prior to the issuance of the April affidavit. By the time the May affidavit was drafted, the CS' information had been extensively corroborated by an undercover DEA agent who met directly with defendant Helfant. Under the common sense analysis condoned by Gates, supra, the issuing magistrate judges were entitled to conclude that the source's information was reliable.

## C. Intentional Omissions of Material Fact

Defendants Helfant and Wiseberg contend that Inspector Richards also deliberately omitted from each of her affidavits facts which were material to the determination of whether the respective warrants should be issued. Defendant Helfant asserts that she purposely omitted facts pertaining the reliability of the CS, and also failed to disclose the facts that: (1) the reported deliveries of unordered drugs could have been the result of a mistake, (2) there had been only one instance in which a pharmacy

27

had been moved (3) the conduct she described did not constitute a crime.

Defendant Wiseberg contends that the investigator omitted the registered address of RX Direct and the location of the tour taken by the CS. She also made no mention in the May affidavit that the CS had told her that Helfant had been planning to move the business shortly after the time that the April warrant was executed, and recited no facts indicating that the pharmacy was still located at the Deerfield Beach address. Another purported omission was Investigator Richards' failure to advise Judge Torres that the entire hard drives of the four RX Direct computers had been copied during the April search. In fact, the May affidavit omitted any mention of whether computers had been observed during the execution of the April warrant.

In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court established the procedures to be utilized where a defendant challenges the truthfulness of averments in an affidavit used to procure a search warrant:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and with the affidavit's false material set to one side, the affidavit's remaining content is

> insufficient to establish probable cause, the
> search warrant must be voided . . .

Id. at 155-156.

Allegations that the statements of the affiant were merely negligent or the result of innocent mistake are insufficient, and the deliberate falsity or reckless disregard must be directed toward the affiant, not toward an informant whose statements are contained in the affidavit.  Id.

A person who seeks to challenge the veracity of an affidavit in support of a search warrant or wiretap application must meet the threshold requirement of a "substantial preliminary showing" that false statements were deliberately or recklessly made.

> There must be allegations of deliberate
> falsehood or of reckless disregard for the
> truth, and those allegations must be
> accompanied by an offer of proof. They should
> point out specifically the portion of the
> warrant affidavit that is claimed to be false;
> and they should be accompanied by a statement
> of supporting reasons. Affidavits or sworn or
> otherwise reliable statements of witnesses
> should be furnished, or their absence
> satisfactorily explained.

Id. at 171.

The same analysis applies where the challenge is to the omission of relevant facts from the affidavit.  United States v. Harvey, 560 F.Supp. 1040, 1074 (S.D. Fla. 1982), aff'd, 789 F.2d 1492 (11th Cir. 1986), cert. denied, 479 U.S. 855 (1986).

The undersigned found that defendants Helfant and Wiseberg were entitled to a Franks hearing on a few limited issues.

29

Inspector Richards testified that when the April warrant was executed, copies were made of the hard drives of the computers at RX Direct.  These were sent to the FBI for analysis, but that analysis was never performed and the copies never were returned to DEA. No notification (delayed or otherwise) was made to the owners of RX Direct that the April search had taken place, although they were notified of the May search.

Investigator Richards also testified that the CS involved in the case was a convicted felon who was working for DEA in the hope of reducing his sentence.  She stated that she did not omit this information from her affidavit in order to mislead the magistrate judges, but in retrospect she acknowledged that this was information the judges might have deemed important.

Investigator Richard stated that she had supervised the seizure of the computers during the execution of the May search warrant, but that the computers had been sent to DEA analysts, who are not agents, to perform the analysis.

The court finds that there was no attempt to mislead Judge Torres by failing to advise him that the computer hard drives had been copied during the execution of the April warrant, since no analysis had been performed on the copies, which were no longer in DEA possession.  Regarding the status of the CS, courts consistently have held that failure to advise a judge of the extensive criminal history of an informant will not invalidate a warrant issued in reliance upon information provided by that

30

informant.  United States v. Ofshe, 817 F.2d 1508 (11th Cir. 1987),
cert. denied, 484 U.S. 963 (1987); United States v. Coronel, 750
F.2d 1482 (11th Cir. 1985); United States v. Haimowitz, 706 F.2d
1549 (1983), cert. denied, 464 U.S. 1069 (1984).

Defendant Helfant's other listed omissions, the "facts"
that the reported deliveries of unordered drugs could have been the
result of a mistake, that there had been only one instance in which
a pharmacy had been moved and that the conduct she described did
not constitute a crime, are not material facts.  If anything, they
are inferences or conclusions to be drawn by the issuing judge.

Similarly, defendant Wiseberg's remaining omissions: the
registered address of RX Direct, the location of the tour taken by
the CS, and (in the May affidavit) the CS' report that Helfant had
been planning to move the business shortly after the time that the
April warrant was executed, are not facts which were material to
the issuance of the warrants.   Finally, the listing of the
Deerfield address on the May warrant was a sufficient allegation
that RX Direct still was operating at that address.

Neither  defendant  Helfant  nor  defendant  Wisebeg  has
established that Investigator Richards is guilty of the deliberate
or reckless omission of facts material to the issuance of either of
the two warrants, and the defendants are not entitled to prevail on
this ground.

**D. Surreptitious Entry and Delayed Notice (April Warrant)**

Defendants Helfant and Wiseberg assert that the facts set forth in the affidavit supporting the April warrant did not justify surreptitious entry or delay in notice.   Fed.R.Crim.P. 41(f)(3) authorizes a magistrate judge, upon request of the Government, to delay notice of the execution of a search warrant.   The rule does not limit the time for which delay may be authorized.

The defendants rely on United States v. Villegas, 899 F.2d 1324 (2nd Cir. 1990), cert. denied, 498 U.S. 991 (1990), for the proposition that the delay should not exceed seven days. In that case, the court acknowledged that "certain types of searches or surveillances depend for their success on the absence of premature disclosures," and "[w]hen nondisclosure of the authorized search is essential to its success, neither Rule 41 nor the Fourth Amendment prohibits covert entry."   Id. at 1336.   However, the court believed that certain limitations should be imposed by the issuing judge:

> First, the court should not allow the officers to dispense with advance or contemporaneous notice of the search unless they have made a showing of reasonable necessity for the delay.
> . . .
> Second, if a delay in notice is to be allowed, the court should nonetheless require the officers to give the appropriate person notice of the search within a reasonable time after covert entry. . . . [A]s an initial matter, the issuing court should not authorize a notice delay of longer than seven days.   For good cause, the issuing court may thereafter extend the period of the delay.

Id. at 1337.

As the Government points out, there is no similar time
limit suggested or required in this Circuit.  The affidavit in
support of the April warrant listed the following reasons for
surreptitious entry and delayed notice: the risk that
electronically stored records would be lost, destroyed or moved to
an unknown location in the event that the pharmacy operation was
moved; the risk that an ongoing undercover investigation would be
compromised; the possible danger to the life or physical safety of
the CS; the possible flight by the subjects of the investigation,
and the possibility that the subjects of the investigation would
destroy or tamper with evidence at locations that had not yet been
identified by the investigators.

These reasons clearly supported a delay in notice, and
based on the nature of the investigation, seven days would not have
been sufficient.  In fact, the defendants were give *de facto* notice
of the investigation within three weeks, when the May warrant was
executed.  The need for the immediate copying of computer records
in April was premised upon the belief that RX direct might soon
move.  When that did not occur, a search was executed during normal
business hours.

Based on the facts set forth in the warrant, the
nighttime entry and delay in notice were justified.  Defendant
Wiseberg also contends that there was no justification for copying
the information on the computer hard drives, pointing out that with
most "sneak and peek" warrants, no evidence is seized.  However,

the defendant cites no case which precludes the copying of records during the execution of a search warrant. Moreover, the Government does not seek to introduce the photocopies (which remain in the possession of the FBI), and no information gleaned from the computers was used to support the May warrant. Therefore, there is no basis to suppress any evidence as the result of the copying of the computer hard drives.

Finally, at the hearing on the instant motions, Investigator Richards testified that as the result of agency oversight, no formal notice of the execution of the April warrant ever was given to the defendants. There does not appear to be any case law on the effect of such an omission, and clearly no case holds that evidence must be suppressed based on failure to give notice of the search. In the instant case, since the defendants clearly were notified of the May search, which is the only search resulting in the seizure of evidence which the Government seeks to introduce at trial. The undersigned finds that the defendants suffered no prejudice based on the Government's failure to provide notice of the April search, and no evidence need be suppressed as the result of this error.

**E. Seizure of Computers (May Warrant)**

Defendant Helfant asserts that the agents who executed the May warrant exceeded the scope of the warrant, which did not authorize the seizure of computers. As set forth above, the May warrant did explicitly authorize the seizure of records stored on

34

computers.  Additionally, the affidavit in support of the warrant
identified the computers as instrumentalities of the crime, as well
as containers of incriminating records.

Courts which have addressed this issue uniformly have held
that the seizure of computers, and subsequent analysis away from the
search premises, was proper. <u>United States v. Sprewell</u>, 936 F. 2d
581 (9th Cir. 1991)(unpublished); <u>Fermaglich v. State of Indiana</u>,
2004 WL 2650262 (S.D. Ind. Sept. 29, 2004); <u>United States v.
Sissler</u>, 1991 WL 239000 (W.D. Mich. Aug. 30, 1991), *cert. denied*,
506 U.S. 1079 (1993).  These cases were decided based on the well-
established rule that if a warrant sufficiently describes the
premises to be searched, this will justify a search of the personal
effects therein belonging to the person occupying the premises if
those effects might contain the items described in the warrant.
<u>United States v. Ross</u>, 456 U.S. 798, 820-21 (1982); <u>United States
v. Gomez-Soto</u>, 723 F.2d 649, 654 (9th Cir.) *cert. denied,* 466 U.S.
977 (1984).

In the instant case, the seizure of the computers located
at RX Direct clearly was contemplated by affidavit and implicitly
authorized by the May search warrant.  Once the computers were
properly seized, the analysis of their contents at a later time by
DEA personnel who were not Special Agents did not violate the terms
of the warrant.

## F. <u>Over-breadth and Insufficient Particularity</u>

Defendants Helfant and Wiseberg's final claim is that the
search warrants were over broad and failed to identify the items to

be seized with sufficient particularity, resulting in the wholesale seizure of documents.[3]   The Supreme Court has recognized that search warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no place in this area." United States v. Ventresca, 380 U.S. 102, 108 (1965).

In the instant case, involving a business which was alleged to have existed solely for the purpose of distributing drugs illegally, the documents which were to be seized were described with sufficient particularity. United States v. Wuagneux, 683 F.2d 1343, 1348-50 (11th Cir. 1982), cert. denied, 464 U.S. 814 (1983). Additionally, the good faith exception assumes that "the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant." Leon, supra at 918 n.9.

Finally, as the Government points out, even if the description of the items to be seized was deficient, the evidence seized is still admissible if the executing agents relied on that description in good faith. United States v. Travers, 233 F.3d 1327 (11th Cir. 2000), cert. denied, 534 U.S. 830 (2001), citing Leon, 468 U.S. at 923; United States v. Norton, 867 F.2d 1354, 1360 (11th

---

[3] Defendant Helfant also complains that the April search warrant failed to limit the documents to be seized by date. However, this claim is moot, since the Government does not seek to introduce any evidence seized pursuant to April warrant.

Cir. 1985). In the instant case, the court concludes that there is no basis for a finding that the warrants were so facially deficient that the executing officers could not reasonably presume them to be valid. Therefore, the good faith exception applies to this claim, and there is no basis to invalidate the warrants on the grounds that they were over broad.

## G. Standing of Defendants Cruz, Marhee and Walker

Defendants Cruz, Marhee and Walker have sought to adopt one or more of the motions to suppress. The Government argues that none of these defendants had a reasonable expectation of privacy in the premises searched. Neither defendant Marhee nor defendant Walker presented any evidence on this issue, and the undersigned finds that these defendants have failed to establish standing. Accordingly, they cannot seek to suppress any items seized pursuant to the search warrants issued for the premises of RX Direct.

Defendant Cruz did testify on this issue. He stated that he was the manager in charge of the pharmacy at that time of the search, possessing a key to the front door and other doors within the pharmacy. Mr. Cruz' diplomas were at the front of the premises, and his computer was in the regular pharmacy area. Additionally, Mr. Cruz had the code to the burglar alarm and was free to go anywhere within the pharmacy.

Mr. Cruz' car was registered listing the address for the pharmacy, but this was done as the result of the fact that he was experiencing marital problems and believed that he might have to

37

move from his residence. He received professional mail at the pharmacy, as well as mail pertaining to his car insurance.

On cross examination, Mr. Cruz testified that he was never an officer or resident agent for the pharmacy. He was an employee who was paid by regular payroll check, and received a W-2 federal tax form from the company. Mr. Cruz did not keep personal documents (other than those pertaining to his car) at the business premises, but did keep a toiletries and a change of clothes. He did not receive personal mail there and there was no area within the pharmacy that used only by him. Others used the same computer, and Mr. Cruz did not know the computer password.

Based on Mr. Cruz' testimony, the undersigned finds that he did not have a reasonable expectation of privacy in the premises searched, and lacks standing to challenge the search warrants. *See*, United States v. Chavez, 169 F.3d 687, 690-91 (11th Cir. 1999), *cert. denied*, 528 U.S. 1048 (1999).

### IV. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that:

1. Defendant **Howard Helfant's** Motion to Suppress Evidence (DE 504) be DENIED;

2. Defendant **Paul Wiseberg's** Motion to Suppress Evidence and Request for a *Franks* Hearing (DE 518) adopted by defendants **Edgar Cruz and Thomas Walker** be DENIED;

3. Defendant **Frank Hernandez'** Motion to Suppress: No Crime Delineated to Support Issuance of Search Warrant (DE 533) adopted by defendant **Steve Marhee** be DENIED, and

4. Defendant Amada Hernadez' Motion to Suppress: No Crime Delineated to Support Issuance of Search Warrant (DE 534) be DENIED.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 4th day of October, 2007.

*Lurana S. Snow*

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA Ellen Cohen (WPB)
Richard Hersch, Esq. (D-Frank Hernandez)
Omar Guerra Johansson, Esq. (D-Amada Hernandez)
Chris Grillo, Esq. (D-Marhee)
Greg Ross, Esq. (D-Marhee)
Bruce Lyons, Esq. (D-Antonio)
Joe Rosenbaum, Esq. (D-Pinkoff)
Jon May, Esq. (D-E.V.A. Global & Tropical)
David Bogenschutz, Esq. (D-Antoniou)
David Vinikoor, Esq. (D-Wiseberg)
Jeffrey Voluck, Esq. (D-Helfant)
Sean Ellsworth, Esq. (D-Francois)
Alberto Acuna, Esq. (D-Concept RX)
Jeff Harris, Esq. (D-Cruz)
Michael Hursey, Esq. (D-Walker)
Richard Della Fera, Esq. (D-Echols)
Dan Forman, Esq. (D-Edwards and Local Counsel for Hardiman)
Mark Hardiman, Esq. (D-Edwards)
AFPD Chantel Doakes (FTL) (D-Baron)